CHARLES E. SKINNER, as Trustee of the SMITH MOQUETTE LOOM COMPANY, Appellant, v. WARREN B. SMITH and Others, Respondents.

*Right of all the directors, shareholders and creditors in a corporation to transfer to themselves patent-rights held by the corporation and substitute therefor their notes — right to wind up a private corporation.*

No principle of law or of public policy is violated by an agreement by which all the directors and shareholders of a trading corporation, the capital stock of which is represented by a patent which such parties have assigned in payment therefor, take reassignments to themselves of such patent from the corporation and give their promissory notes to the corporation in place thereof, where there are no creditors of the corporation.

There is no obligation to the State or to the public imposed upon a private manufacturing corporation to carry on the business for which it was formed. It may, at any time, put an end to its transactions and voluntarily wind up its affairs.

APPEAL by the plaintiff Charles E. Skinner, as trustee of the Smith Moquette Loom Company, from a judgment, entered in the office of the clerk of the county of Westchester on the 27th day of March, 1888, dismissing the complaint in the above-entitled action, with costs and disbursements, and from an order, entered in said office on the 28th day of February, 1888, granting to the defendants an extra allowance.

The action was tried before the court, without a jury, at a Special Term held in the county of Dutchess on the 24th day of March, 1888. The complaint demanded judgment that certain resolutions of the defendant, the Smith Moquette Loom Company, be rescinded; that the defendants, other than said company, render an account for certain certificates, representing shares of the capital stock of said company, and that certain assignments specified in the complaint be set aside, rescinded and canceled, and that the defendants, other than said company, be required to execute suitable instruments, in writing, for the purpose of vesting in the Smith Moquette Loom Company the legal title to a certain patent, with the invention thereby secured, and any and all reissues thereof, etc.; and that they also be compelled to account for all accounts, profits and advantages by them in any manner made by reason of the transactions set forth in the complaint.

*Theron G. Strong*, for the appellant.

*Joseph H. Choate* and *Theodore Fitch*, for the respondents.

DYKMAN, J. :

On the 15th day of January, 1877, letters-patent of the United States were granted to Alexander Smith for an improvement in looms, and the invention thereby secured was very valuable. When he died he left two children, Warren B. Smith and Eva S. Smith, now the wife of William F Cochran. There were, likewise, letters-patent for a similar invention granted by foreign governments, and at the death of Alexander Smith all the patents came to his two children and belonged to them. Later, however, it appears that William F. Cochran became the owner of one quarter of the patent and his wife retained a quarter also, while Warren B. Smith continued to own the one-half.

Being thus the owners of all the patents, on the 13th day of December, 1878, those three persons organized the Smith Moquette Loom Company under the general manufacturers' act of 1848, with a capital stock of $40,000, and transferred the title of the patents to the corporation at that valuation, for the purpose of collecting and distributing the dividends to accrue from the royalties for the use of the patents ; and while the certificate of incorporation recited other objects for which the company was formed, yet no other business was transacted by the company down to the 21st day of September, 1880, when the corporation was re-organized in the manner to be hereinafter stated.

At that time the demand for moquette carpets was large, and the future prospects of manufacturing were encouraging, and the defendants concluded that it would be advantageous to the company to engage in such manufacturing ; and as they were unwilling to part with the exclusive ownership of the patent and invention, they concluded to retransfer the same to themselves individually at the same nominal figure at which they had transferred it to the company, and to enable the company to go into manufacturing, erect the necessary buildings, buy machinery and to manufacture, that its capital stock should be increased to $600,000, all of which should be issued to themselves ; $40,000 of that amount of money to be paid in by them for the retransfer of the patent in lieu of the 40,000 shares

originally issued to themselves which were to be surrendered; $210,000 of that amount to be paid in cash by themselves and the residue of $350,000 for an unlimited license to use the patents upon payment of the same royalty paid by the Alexander Smith & Sons Carpet Company, namely, twenty cents per yard.

The proceedings under the act for authorizing the proposed increase of capital were completed. The resolution was passed by the board of trustees of the company on the 19th day of October, 1880, to transfer the patent and invention to the defendants individually for the sum of $40,000 in the following proportions: Two equal undivided fourth parts to Warren B. Smith; one equal undivided fourth part to William F. Cochran, and one equal undivided fourth part to Eva S. Cochran, reserving, however, the right and license to manufacture and sell carpets under its United States patents, upon issuing to the assignees 3,500 shares of this capital stock and paying, as a royalty therefor, at the same rate as that paid by the Alexander Smith & Sons Carpet Company under its existing license. On the same 19th day of October, 1880, assignments of the letters-patent, and the invention secured thereby, were executed and delivered by the Smith Moquette Loom Company to Warren B. Smith, William F. Cochran and Eva S. Cochran, respectively, in the proportions above named, each of which assignments was expressly made subject to two licenses held by said Smith Carpet Company and the Hartford Carpet Company, and reserving the license and right to manufacture and sell the patented improvements to the end of the term of the patent, upon payment of a royalty therefor at the same rate as then paid by the Alexander Smith & Sons Carpet Company and the Hartford Carpet Company, it being understood that such royalties were to be paid to the assignees and owners of the patent.

The entire amount of stock of the company, to wit, 6,000 shares, was issued to the defendants on the 18th day of November, 1880, as follows: To Warren B. Smith one certificate for 3,000 shares; to William F. Cochran one certificate for 1,500 shares, and to Eva S. Cochran another certificate for 1,500 shares. The consideration therefor being, in the aggregate, $40,000 to all the defendants for the retransfer of the patent, and in lieu of the original 400 shares which were surrendered by them; $210,000 in cash subsequently

paid by said defendants for such amount of stock at par, and $350,000 for the right or license to the company to use an unlimited number of looms under said patent upon payment of a royalty of twenty cents per yard license to manufacture under said patent, being limited to only two other companies in the United States, one of which had the right to run about one hundred and the other sixty-two looms. From the incorporation of the Moquette Loom Company until the issuance of the 6,000 shares of stock, after the issue thereof was authorized, and until the 1st day of March, 1881, no person other than the defendants had any interest in the corporation. There were no other stockholders, and they held all the stock and were the only trustees and officers. They alone had any interest in its business or property, or in its continuance or dissolution, and there were no creditors.

The original transfer of the invention and patent by the individual defendants to the company for $40,000 was made by them without any regard to its actual value, which was many times greater than that sum, and solely as a convenient mode of holding and enjoying title to the same, and to the royalties to be derived therefrom for their exclusive benefit, as the sole owners. At the time of the retransfer of the patent and invention the value thereof had not materially changed, and the retransfer at the same price at which the same had been conveyed to the company was made by the defendants without regard to its actual value, in good faith, in the belief that they had the legal right to cause the retransfer to be made by the company on the terms on which it was made, and without any design or intent to injure or defraud any person who might thereafter become the holder of any of the increased stock to be issued by the company, and no such person, or any person, was injured or defrauded thereby.

The unlimited license to manufacture under the patent, upon payment of a royalty of twenty cents per yard, was necessary for the manufacturing business of the Smith Moquette Loom Company, and was not an inadequate consideration for the amount of 3,500 shares of its capital stock, then issued therefor to the defendants according to their belief and expectation at that time as to the manufacturing possible to be done by said company, and the issue thereof for that consideration was made by them in good faith and

with no intent to defraud the company or any future holder of stock therein. Although the capital stock of the company was authorized to be increased to $600,000 by a certificate filed September 23, 1880, it was not actually increased until the 6,000 shares of capital stock were issued to the defendants on the 18th day of November, 1880. When the patent was sold to the defendants for $40,000 and the assignments thereof were executed and delivered to them on the 19th day of October, 1880, the amount of its capital stock was only $40,000. Subsequently the defendants surrendered the certificates issued to them on the 18th day of November, 1880, and received in exchange therefor certificates of various amounts aggregating, however, the same amount of shares as such surrendered certificates.

On the 31st day of March, 1881, the defendants assigned 1,000 shares of the stock so held by them to the plaintiff and Eugene Tymeson, each of whom received 500 shares, being 250 shares from Warren B. Smith, 125 shares from William F. Cochran and 125 shares from Eva S. Cochran, the certificates for which aggregate amount of 1,000 shares were assigned by the defendants out of their stock and the consideration for which was given to the Moquette Loom Company, consisting of an assignment of certain letters-patent held by the plaintiff and Mr. Tymeson for improvements in looms. The plaintiff and Mr. Tymeson, at and before the time they assigned the patents to the Moquette Loom Company and took an assignment of such certificates of stock, had knowledge that the Loom Company did not own the Smith Moquette Loom Patent, but had only a right or license to use the same upon payment of a royalty, and that the patent had been transferred to the original owners, Warren B. Smith, William F. Cochran and Eva S. Cochran.

The negotiations for the purchase of the Tymeson and Skinner patents were continued between the plaintiff and the defendant Smith, and the defendant informed the plaintiff, before the same were closed, that the Smith Moquette Loom Patent had been reassigned to the original owners, himself and Mr. and Mrs. Cochran, and that the capital stock had been increased to $600,000, and that had all been issued to the defendants, who were to put in $250,000 in cash, and that the company was to have a license to manufacture upon a royalty of twenty cents a yard. No misrepresentations were

made to the plaintiff or Mr. Tymeson to induce them to assign their patents or accept any stock.

While the factory of the company was being built, the individual defendants sold 1,000 shares of the stock of the company held by them to W. J. Sloane, who took their stock from the defendants at par, paying them $100,000 therefor, and the stock therefor was thereupon issued to John Sloane, 500 shares on the 16th day of September, 1881, and 500 shares on the 14th day of January, 1882; and John Sloane became a stockholder and trustee of the company, and before he purchased his stock he was informed of the fact that the company had assigned the loom patent to the individual defendants and held only a license, and sought only to manufacture under said patents upon payment of a royalty of twenty cents per yard; and that the patent had been purchased for the sum of $40,000 from the company by the individual defendants, and that they had also paid $210,000 for that amount of stock; and that 3,500 shares of the stock had been issued to them for the right or license to the company to manufacture upon payment of said royalty; and Mr. Sloane was cognizant of, and approved of, all the prior and subsequent proceedings of the defendants in regard to the affairs of the company. The only other stockholder to whom the defendants assigned any of their stock was Frank T. Holder, who became a trustee of the company, and who learned of the facts immediately above stated and approved of the proceedings of the defendants, and held his stock merely at their pleasure and as their property, and parted with no consideration therefor.

Under the management of the defendants the company proceeded to erect factory buildings, purchased looms and machinery and the necessary stock and commenced the business of manufacturing moquette carpets, and continued the same until about the close of the year 1882, and all of the money required therefor was furnished by the individual defendants. In addition to the sum of $250,000 in the treasury of the company arising from the $40,000 realized upon the retransfer of a patent to the defendants, and the sum of $210,000 in cash contributed by them for that amount of stock, a much larger sum was loaned by them to the company in order to meet its business necessities, which sum so loaned was $378,750.20, and with interest thereon from November 1, 1882, on the 1st day

of February, 1883, amounted to $384,627.40, at which time the defendants made a demand in writing upon the company for the payment of the amount of the indebtedness.

The manufacturing business had been done at a loss, and at the beginning of the year 1883 there was stagnation in the demand for moquette carpets, the market was over-stocked, and there was no prospect of continuing the manufacturing business of the company at a profit, and no business could be carried on without additional money, which the defendants were unwilling to advance, and there was no means of procuring the same; and at that time it appeared that the continuance of the manufacturing business could only result in an increase of the loss already incurred. At a meeting of the trustees, held February 3, 1883, the resolutions offered by Mr. Sloane and set forth in the complaint were unanimously adopted, whereby it was determined to cease manufacturing, to lease to the Alexander Smith & Sons Carpet Company the real property and the machinery of the Moquette Loom Company for fifteen months from February 1, 1883, at an annual rent of $15,000, and payment of taxes and assessments accruing during said term; also to sell to the same company the merchandise and stock on hand, and pay over the net proceeds realized therefrom to the individual defendants, to apply on account of the company's indebtedness to them; also to give to the individual defendants, who were such creditors, a bond for the residue of the account secured by mortgage, both on the company's real estate and also upon its machinery, tools and fixtures, provided the assent of the majority of the stockholders owning at least two-thirds of the capital stock should first be filed in the Westchester county clerk's office; also authorizing the due execution and delivery of the proper papers required to carry the resolution into effect. The defendants and Mr. Sloane voted for the resolutions in good faith, believing that there was no other way to save the Moquette Company and its stockholders from further loss, and that the acts and proceedings therein directed were for the best interest of the company and its stockholders, and such was the fact; and the defendants in passing the resolutions did not intend to injure or defraud the plaintiff, as a stockholder of the company, and did not, in fact, injure or defraud him. The resolutions so adopted by the board of trustees were necessary and were for the best interest of the company and the

stockholders, and no better or other arrangement to save the company and its stockholders from further loss was practicable.

Immediately prior to the meeting of the board of trustees, on the 3d day of February, 1883, a meeting took place between the defendants John Sloane and the plaintiff, at which meeting the plaintiff was apprised of the necessity of closing the business of the company, but he made no suggestion in respect to a remedy for the difficulties in which the company was involved. The resolutions of February 3, 1883, were carried into effect; the lease to the Smith Carpet Company was executed, the merchandise and stock on hand was sold to the same company, at cost price, for the sum of $207,605.85, which amount, less $25,511.23, the sum due to the carpet company from said loom company, was paid by the carpet company to the loom company, and by it applied to that extent in liquidation of the indebtedness of the loom company to the defendants. The bond and mortgage from the company to the defendants was executed and delivered, the assent of the majority of the stockholders owning at least two-thirds of the capital stock of the company, having been first obtained and filed in the Westchester county clerk's office. About fifteen months later proceedings were commenced to foreclose the bond and mortgage. The judgment of foreclosure and sale under the real estate mortgage was entered in this court on about June 2, 1884, and the factory property described therein was sold by the referee appointed by the court for that purpose, at public auction, and on the 24th day of June, 1884, after due notice, to Warren B. Smith, for the sum of $50,000, and a deed therefor was delivered to him by the referee, and the amount realized upon said sale was applied pursuant to the terms of the judgment in payment of the amount due the mortgagees as adjudicated by the court. The order confirming the report of said referee was entered about June 27, 1884, whereby it appeared that the deficiency upon the judgment was then $143,660.62, with interest from June 24, 1884, for which judgment was then entered against the company. Thereafter, due proceedings were had for the foreclosure of the chattel mortgage upon the machinery, tools and fixtures, and the same was sold at public auction to Warren B. Smith for $100,000, and the net amount so realized was applied to that extent in payment and liquidation of the amount of $143,660.62, with interest, then due to

the said defendants. Both of these mortgage sales were regularly and fairly conducted, and the amount bid for the property, and for which the same was sold, was an adequate and sufficient consideration for the property. The defendant Smith still holds the title to the real and personal property, and in purchasing the same he acted for himself and William F. Cochran and Eva S. Cochran, and all his acts and proceedings were in good faith and without any fraudu-lent or improper motive. There are no creditors of the Smith Moquette Loom Company other than the individual defendants in this action.

The principal dispute respecting the facts, related to the knowledge of the plaintiff of certain transactions of the loom company previous to the acquisition of his stock; but most of the facts recited were found by the trial judge, and they are well sustained by the evidence. With the facts thus before us we are prepared for the examination of the case. It is the primary object of the action to procure the nullification of the reconveyance of the patents to the individual defendants by the loom company, and, second, to procure the sur-render of the 3,500 shares issued to the defendants for the unlimited license to manufacture carpets under the loom patent; and, third, to annul the proceedings of February 3, 1883, and to set aside the judgment and the proceedings in the foreclosure suit and compel the defendants to account for the property received. The action is brought under section 1781 of the Code of Civil Procedure, which is sufficiently comprehensive to justify its commencement.

The plaintiff invokes the provision of the Revised Statutes in condemnation of the retransfer of the loom patents to the defend-ants upon the re-organization of the company in September, 1880. That statute reads as follows, so far as it has any application to this action : "It shall not be lawful for the directors or managers of any incorporated company in this State to make dividends excepting from the surplus profits arising from the business of such corpora-tion ; and it shall not be lawful for the directors of any such company to divide, withdraw or in any way pay to the stockholders or any of them any part of the capital stock of such company, or to reduce the said capital stock without the consent of the legislature." (3 R. S. [8th ed.], 1728.) This statute fell under the consideration of the Court of Appeals in the case of *Williams* v. *The Western Union Telegraph Com-*

*pany* (93 N. Y., 187), and this was the construction it there received: "These provisions were intended to prevent the division, distribution, withdrawal and reduction of the property of a corporation below the sum limited in its charter or articles of association for its capital, but not to prevent its increase above that sum. The purpose was to prevent the depletion of the property of the corporation, thereby endangering its solvency. All the other provisions of the section show very clearly that such was the intention. Careful provision was made that the whole amount of capital stock should be paid in, and hence there was a prohibition against receiving a note or other evidence of debt in payment of any installment actually called in and required to be paid; and in case the directors violated any of the provisions of the section they were made individually liable to the corporation and to its creditors, in the event of its dissolution, to the full amount of the capital stock of the company so divided, withdrawn or reduced. All these provisions show that it was the purpose of the legislature, by means of them, to create a property capital for the corporation, and then to keep that intact so as to secure the solvency of the corporation and its responsibility to its creditors. The 'capital stock' in this section does not mean share stock, but it means the property of the corporation contributed by its stockholders or otherwise obtained by it to the extent required by its charter."

This elucidation of the statute makes it plain that it can have no application to this case. It was designed to suppress fraud and protect creditors and persons who might become creditors or stockholders in reliance upon false appearances. Making dividends without surplus profits or dividing, withdrawing or paying to stockholders any part of the capital of the company or reducing its capital stock are all acts of maladministration, and fall under the condemnation of the statute, but neither of these acts have been committed by these defendants.

Turning back for a moment to the formation of the loom company, we find it organized by three persons with the sole and only object of placing the ownership of the patents in a corporation as a convenient agency for the issuance of licenses and the collection of royalties, and where the title would be perpetuated and free from the uncertainties of life, bankruptcy and other contingencies.

The three incorporators owned the patent before its assignment to the company, and, in equity, they owned it afterwards, for they owned all the stock issued for the patent by the company. There were no creditors, and there could be none, for the company embarked in no business requiring credit. It engaged in nothing but the collection of royalties. The patent was its only property and its only wealth, and the company had more of the attributes of a partnership than of a corporation. In reality, and in substance, it was a special partnership, as all trading corporations are, and members of such corporations are never merged in the company. (*Bank of United States* v. *Deveaux*, 5 Cranch, 61.)

The incorporators owned the patent before they put it into the company, and they owned it afterwards. They owned the company and all it represented, and they could dissolve it and resume their private ownership of all its property, or they could re-organize it in any manner and on any basis. There was no purpose of deception or fraud, and there was no one to be deceived but themselves. Towards the public and the law it maintained the attitude of a partnership, and there were none to molest it, and none to interfere with the absolute control and management of the company by the members and shareholders. Thus the company pursued the business for which it was originally organized, collecting the royalties, distributing them as dividends among the three individual defendants in this action until the time of the re-organization of the company, when they concluded to commence the manufacture of carpets, and for that purpose to increase the capital stock of the company. Preliminarily, and for the purpose of retaining the ownership and control of the patents, they determined upon their retransfer to themselves individually, and that was done in the proportions in which they held them at first. Then they increased the capital stock of the company to $600,000, all of which they issued to themselves in the manner already recited. Down to that time no persons but the original incorporators had any interest in the company; they held the entire stock and were the only trustees. They might have dissolved the corporation themselves and taken back their patents and then made up a new company so long as these defendants alone were interested. Instead of adopting that method for the withdrawal of the patents, they substituted a promissory

note of $40,000 in the place of the patent, leaving the other $560,000 to be raised by the issuance of new stock for cash and property at its full value. All the demands of the law were thus satisfied and the rights of future creditors and stockholders were fully protected. The trustees were the corporation, and they were the shareholders, and the legal title to the patents was held by the company for their benefit alone, and the withdrawal of the patent and the substitution of the note therefor was not a violation of the statute. No principle of law or public policy is violated by an agreement between parties about to form a trading corporation, by which the capital stock is to be represented by property which they contribute, if the transaction is free from fraud. As, therefore, these original contributors and trustees capitalized a patent at $40,000, they might withdraw the same and substitute their promissory note for that sum as so much cash. There was none to object. The actors included the directors and shareholders, and there were no creditors.

The circumstances surrounding the case are peculiar, in that the individual defendants in this action in all their transactions in the formation of the company and in its re-organization were really dealing with themselves and with their own property, and our conclusion is that the return to the defendants of the patents and the payment to the company of $40,000, representing all the stock issued before that time, was not a withdrawal of capital within the prohibition of the Revised Statutes.

The claim to invalidate the issuance of the 3,500 shares of stock issued to the defendants for the license to manufacture under the patent cannot be enforced by or for the benefit of the corporation. When that stock was delivered to the defendants it became their property free from any liability of the corporation itself. (*Farnsworth* v. *Wood*, 91 N. Y., 308.) But there is no basis here for a liability to any one in respect to those 3,500 shares, because there was no fraudulent purpose in its acquirement and no intention to evade the statute.

Neither can this action be maintained for the purpose of setting aside or invalidating the resolutions of February third for closing the business of the company. The finding of the trial judge competely established the good faith of the defendants and the absolute necessity of the resolutions and transactions in order

to save the company from further loss. The enterprise for which
the corporation had been re-organized had failed, and its business
from the beginning had been conducted at a loss. It had contracted
a very large debt and it seemed to be impossible to continue the
business without further means, and the defendants had made the
advances beyond the power of the company to secure them. In all
trading corporations it is entirely competent for a majority of the
stockholders to dissolve the company and bring its business to a close.

"Commercial corporations are ordinarily formed solely for the
benefit of their shareholders. It is, therefore, no more than reason-
able that the corporators should be authorized to give up their
speculation and wind up the company's business, if it should turn
out to be unprofitable or otherwise undesirable."

"The law is settled accordingly, and it may be stated as a rule, that
it is an implied condition in the charter of every corporation
formed solely for the pecuniary profit of its shareholders, such as
an ordinary trading or manufacturing corporation, that its business
may be wound up whenever the majority deem this to be expedient.
Under these circumstances, the majority may, without the consent
of the minority, sell the whole of the company's property, close up
the business, distribute the assets and surrender the charter to the
state." (Morawetz on Corporations [1st ed.], § 211 ; *Treadwell* v.
*Salisbury Company,* 7 Gray, 393.)

There is no obligation to the State or to the public imposed upon
a private trading corporation to carry on the business for which it
was formed. It may at any time put an end to its transactions and
voluntarily wind up its affairs. Its franchise of acting in a corpo-
rate capacity is merely permissive, and not obligatory, hence in
such case a forfeiture for non-user of franchise cannot be based
upon neglect of duty upon the part of the company. (Morawetz on
Corporations, § 651.) The theory and arguments of the plaintiff
are based upon technical rules of law applicable in particular cases
for the protection of creditors and the prevention of frauds upon
stockholders, but they cannot be applied to this case. The plaintiff
has received everything he was entitled to receive, and so has the
company, and the corporation cannot recover from the shareholders
what the trustees and officers have agreed they should receive in the

absence of fraud. Why should there be any interference with these defendants? They have done what they would with their own, and they have done no more, and all they did was in the management of their own property and business, and neither the public nor the legislature have any interest in either.

We can discover no principle of law or equity that justifies the demand of the plaintiff in this action. An adjudication that would direct the retransfer of the patent to the company, and invalidate the issue of the 3,500 shares of the stock and the unlimited license to manufacture carpets under the patents, would be equivalent to an order for the transfer of the private property of one person to another.

The judgment should, therefore, be affirmed, with costs, but we find no basis for the support of an additional allowance, and the appeal from that order must be sustained and the order reversed.

PRATT, J., concurred; BARNARD, P. J., not sitting.

Judgment and order affirmed, with costs, except that the order granting an extra allowance is stricken out.